1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  Yvonne Marie Ford,                    Case No.:  16cv13 JLS (NLS)

12                           Plaintiff,   **REPORT AND**
                                          **RECOMMENDATION FOR ORDER:**
13  v.

14  Carolyn W. Colvin, Officially as Acting   **(1) DENYING PLAINTIFF'S**
    Commissioner of the Social Security       **MOTION FOR SUMMARY**
15  Administration,                           **JUDGMENT [Dkt. No. 13]; and**

16                           Defendant.
                                          **(2) GRANTING DEFENDANT'S**
17                                        **CROSS-MOTION FOR SUMMARY**
                                          **JUDGMENT [Dkt. No. 15].**
18

19

20

21

22

23

24

25

26

27

28

Plaintiff Yvonne Marie Ford brings this action under the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the decision of the Social Security Administration ("Commissioner" or "Defendant") to deny her claims for disability insurance benefits.  This case was referred for a report and recommendation on the parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636(b)(1)(B).  After considering the papers submitted, the administrative record, and the applicable law, the court **RECOMMENDS** that Plaintiff's motion for summary judgment and for reversal and/or remand be **DENIED**, and that Defendant's cross motion for summary judgment be **GRANTED**.

## I.   BACKGROUND

### A. <u>Procedural History.</u>

On May 21, 2012, Ford applied for supplemental security income (SSI) benefits under the Social Security Act, alleging a disability that began on January 1, 2011.  Administrative Record (AR) 11, 55, 132-138.  The claim was denied both initially and on reconsideration.  AR 70-74; 78-82.  Upon Ford's request, the claim was heard by an Administrative Law Judge (ALJ) on July 16, 2014.  AR 27-44; 84.  Ford and vocation expert Gregory Jones testified at the hearing.  AR 27-44.  The ALJ issued a decision on July 31, 2014 and found that Ford was not entitled to SSI.  AR 11-21.  The Appeals Counsel denied Ford's request for review on November 10, 2015.  AR 1-3.  Ford timely filed this action, asking this court to reverse the ALJ's decision and award her benefits, or alternatively, to remand it for rehearing.

### B. <u>Ford.</u>

Ford was born in October 1954.  AR 320.  She has an Associate's degree.  AR 320.  Ford began working for in-home support services in August 1999 and provided care to her disabled daughter, who has cerebral palsy and developmental delay.  AR 168, 320, 323, 363.  Her daughter moved into a group home around January 1, 2011, which ended Ford's employment.  AR 168, 320, 363.  Ford alleges she is disabled due to a number of ailments including major depressive disorder, cognitive impairment and obesity.

## C. <u>Documentary Medical Evidence.</u>

### 1.  Treating Psychiatrists: City Heights Family Health Center.

Ford began receiving mental health treatment at the City Heights Family Health Center in 2010, seeing a doctor every one to two months.  AR 413.  She started seeing Dr. Cabrejos there in 2012.  AR 335, 337; 370, 439.  In April 2012 he filled out a Psychiatric Review Form, where he opined that Ford would miss work more than three times per month, and that her poor memory, poor concentration and severe anxiety would make it difficult for her to work at a regular job on a sustained basis.  AR 429-433.  He gave her a GAF[1] of 55 at that time.  AR 429.  In November 2012 he noted that she was "doing better, sleeping better, going to club house during the day," and gave her a GAF of 70.  AR 399.  Dr. Cabrejos completed a second Psychiatric Review Form in January 2013.  AR 370-374.  He again noted that he believed Ford would miss work more than three times a month and was markedly impaired in her ability to maintain regular attendance at work.  AR 372-373.  He gave her a GAF of 60 at that visit.  AR 370.

Dr. Davis took over treating Ford and saw her in March 2013.  AR 413-417.  He also filled out a Psychiatric Review Form and noted that Ford would miss more than three days of work per month due to her inability to concentrate, physical pain, and inability to organize herself and maintain attention.  AR 415.

Dr. Sepulveda began treating Ford in 2014.  AR 439.  He completed a Psychiatric Review Form for her in March 2014.  AR 434-438.  He found that Ford suffered from depression, anxiety and mild cognitive impairment, which resulted in difficulty with concentration, memory and recall.  AR 435.  He believed Ford would miss work more than three times a month due to memory problems and inability to handle mild stress.

---

[1] A Global Assessment of Functioning (GAF) scale runs from 1 to 100 and is used by mental health providers to rate the social, occupational and psychological functioning of an individual.  *See* https://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited Sept. 26, 2016).

AR 436.  He also put her on Aricept for concerns of early Alzheimer's Disease.  AR 436, 439.  Three months later—in June 2014—Dr. Sepulveda said that Ford could perform no work at all due to her cognitive impairment and severe anxiety.  AR 501.

### 2.  Examining Psychiatrists.

#### a.  Dr. Glassman: September 2012

Dr. Glassman met with Ford once and reviewed some of her medical records.  He noted that she suffers from major depression and personality disorder and assigned a GAF of 55.  Dr. Glassman concluded that Ford can understand and follow at least simple instructions, and is mildly impaired in her ability to maintain concentration, persistence and pace, and to adapt to changes and stresses in a work setting.  AR 368.

#### b.  Psychological Evaluation at Alliant University: October 2013

Upon referral from City Heights Family Health Center, Tiffany Wang, M.S. and Dr. Daroglou from Alliant University did a psychological examination of Ford in October 2013.  AR 419-427.  They noted that Ford's cognitive impairment and memory patterns are typical of those seen in Alzheimer's patients, and recommended that she get assessed for it.  AR 425, 426.  They also noted that "[h]er difficulty in storing and retaining learned information will be extremely cumbersome for her to acquire new skills of employment."  AR 424.

### D.  Ford's Function Reports.

From 2012 to 2014, Ford completed five self-assessed function reports.  AR 149-157, 191-202, 228-241, 288-293, 302-309.  Throughout the reports she reported difficulties with memory, concentration, task completion and following instructions.  AR 155, 200, 225, 238, 292, 307.  With these restrictions Ford reported that should could take limited care of her daughter (AR 151), prepare simple meals (AR 150), drive a car and go shopping for food (AR 153), and attend activities at a clubhouse (AR 303).

### E.  Ford's Testimony at the Hearing.

At the hearing Ford testified that she drives and does her own cooking and laundry.  AR 31.  She was her daughter's caregiver for 31 years and was paid by in-home

supportive services.  AR 32.  She stopped working as her caregiver in 2011.  AR 33-34.
Ford also testified that she cannot work due to her depression, inability to concentrate and
anxiety.  AR 37-38.  She said when she does chores around the house, she follows written
instructions on how to do them.  AR 38.

### F.  Vocational Expert's Testimony.

Vocational expert Gregory Jones testified at the hearing.  AR 39-42.  The ALJ
posed a hypothetical with these limitations: can understand, remember and carry out
simple job instructions; cannot perform work that requires directing others, abstract
thought or planning; can maintain attention and concentration to perform simple, routine
and repetitive tasks; and not work in a fast-paced production environment.  AR 39-40.
Jones testified that with these limitations Ford could not perform her past relevant work.
AR 40.  But he said there are jobs in the national economy that she could perform, such
as laundry laborer, industrial cleaner, and dietary aid.  AR 40-41.  In a second
hypothetical, the ALJ asked if any jobs existed for a person with these limitations who
was absent more than three times per month.  AR 41.  The vocational expert testified that
there would be no jobs available in the national economy with that limitation.  AR 41.

In response to questions by Ford's attorney, the vocational expert testified that no
jobs exist in the national economy for a person with the limitations in the first
hypothetical if that person was off task at least 15 percent of the workday, or required
that instructions be repeated on a daily basis.  AR 41-42.

### G.  The ALJ's Decision.

#### 1.  Evaluating Social Security Disability Claims.

To qualify for disability benefits under the SSA, an applicant must show that he or
she cannot engage in any substantial gainful activity because of a medically determinable
physical or mental impairment that has lasted or can be expected to last at least 12
months.  42 U.S.C. §423(d).  The Social Security regulations establish a five-step
sequential evaluation for determining whether an applicant is disabled under this
standard.  20 C.F.R. § 404.1520(a); *Batson v. Comm'r of the Social Security Admin.*, 359

F.3d 1190, 1194 (9th Cir. 2004).

At Step 1, the ALJ determines whether the applicant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  At Step 2, the ALJ determines whether the applicant suffers from a "severe" impairment within the meaning of the regulations.  20 C.F.R. § 404.1520(a)(4)(ii).  If the impairment is severe, the ALJ goes on to Step 3 to decide whether the impairment meets or equals one of the "Listing of Impairments" in the Social Security regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If it does, the applicant is found disabled, and benefits are awarded.  *Id.*  If the impairment does not meet or equal a Listing, the ALJ goes on to Step 4 to determine whether the applicant retains the residual functional capacity to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the applicant cannot perform past relevant work, the ALJ–at Step 5–must consider whether the applicant can perform any other work that exists in the national economy.  20 C.F.R. § 404.1520(a)(4)(v); *Kennedy v. Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013); *see Garrison v. Colvin*, 759 F.3d 995, 1010-11 (9th Cir. 2014) (discussing the sequential process in greater length).

While the applicant carries the burden to prove eligibility at Steps 1 through 4, the burden at Step 5 rests on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Applicants not disqualified at Step 5 are eligible for disability benefits.  *Id.*

## 2.  Substance of ALJ Decision.

The ALJ determined that Ford satisfied Step 1 of the evaluation because she did not engage in any substantial gainful activity since May 21, 2012, the date of her application.  AR 13.

At Step 2, the ALJ found that Ford suffered from the following severe impairments as defined in the regulations: major depressive disorder; anxiety disorder; insomnia; dysthymic disorder; borderline personality disorder; and alcohol abuse in long-term remission.  AR 13.  He found these impairments severe because they more than minimally affected Ford's ability to perform basic work activities.  AR 13.  The ALJ found that Ford's hypertension was managed medically and had only a minimal effect on

her ability to work.  AR 13-14.  But he did consider her weight and potential impact of obesity in determining her Residual Function Capacity (RFC) below.  AR 13.

Moving on to Step 3, the ALJ found that based on the opinions of the treating and examining physicians as well as the medical findings, Ford did not suffer from an impairment or combination of impairments that met or medically equaled one of the impairments in the Social Security Regulations.  AR 14; *see* 20 C.F.R. §§ 416.920(d), 416.925, 416.926.  The ALJ explained the bases for this finding:  Ford had no restrictions in her activities of daily living as she testified that she could cook and do laundry; Ford had only mild difficulties with social functioning and testified she lived with her nephew and his girlfriend; she had moderate difficulties with concentration, persistence or pace; Ford has not experienced extended episodes of decompensation; and as to mental abilities, there is no evidence that Ford has a complete inability to function independently outside of her home.  AR 14-15.

At Step 4 the ALJ found that Ford had no past relevant work.  AR 19.  But she last worked in August 2011 as her daughter's caretaker.  AR 15.  The ALJ considered Ford's impairments and the intensity, persistence and limiting effects of her symptoms, as substantiated by the objective medical evidence.  AR 15.  He found that Ford retained the RFC to perform a full range of work at all exertional levels but with these non-exertional limitations: Ford can understand, remember and carry out simple job instructions; she can maintain attention and concentration to perform simple, routine and repetitive tasks in a work environment without fast-paced production requirements; and she cannot do work that requires directing others, abstract thought or planning.  AR 15.

At Step 5, the ALJ considered Ford' RFC, age, education, work experience in conjunction with the medical-vocational guidelines and testimony of the vocational expert.   AR 20.  He found that jobs exist in significant numbers in the national economy that Ford can perform, including laundry laborer, industrial cleaner and dietary aide, and that Ford could successfully adjust to this work.  AR 20.  Therefore, the ALJ found Ford "not disabled."  AR 20-21.

## II.  **DISCUSSION**

In challenging the ALJ's denial of benefits, Ford argues the ALJ committed reversible error and did not base the decision on substantial evidence because (1) the ALJ failed to provide clear and convincing reasons for rejecting the opinions of the treating physicians; and (2) the ALJ failed to provide clear and convincing reasons for not finding Ford's testimony credible.

### A. **Legal Standard of Review.**

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits.  42 U.S.C. § 405(g).  A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and applies the correct legal standards.  *Batson*, 359 F.3d at 1193.  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001) (citation omitted).  Put another way, it is "more than a scintilla but less than a preponderance." *Thomas v. Barnhart,* 278 F.3d 947, 954 (9th Cir. 2002).  If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld.  *Id.; Batson*, 359 F.3d at 1193.

### B. **Rejection of the Treating and Examining Psychiatrists' Opinions.**

The ALJ gave little weight to the findings of Ford's treating psychiatrists, "including Drs. Cabrejos and Davis, who opined the claimant would miss work more than three times a month" because he found those findings inconsistent with the record on these bases: (1) Ford's mental status examinations were generally normal; (2) Ford considered herself capable to serve as her daughter's conservator; and (3) Ford's symptoms were controlled by medications and therapy.   AR 19.

Ford argues that the ALJ should have credited the opinions of the treating psychiatrists and the examining psychologists.  Specifically, treating psychiatrists Drs. Cabrejos, Davis and Sepulveda all filled out Psychiatric Review Forms where they noted that they anticipated that Ford would, on average, miss work "more than three times a

month" due to her impairments.  AR 431 (April 2012), AR 372 (Jan. 2013), AR 415 (Mar. 2013), AR 436 (Mar. 2014).  Student in training Tiffani Wang, under the guidance of Dr. Daroglou, examined Ford in October 2013 and concluded that she "likely would not be able to return to the workforce."  AR 427.  Defendant argues the ALJ rightfully rejected these findings because they were inconsistent with the clinical findings.

Where a treating doctor's opinion is not contradicted by another doctor, the commissioner can only reject the treating doctor's opinion for "clear and convincing" reasons. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Where the treating doctor is contradicted by another doctor, the commissioner must provide "specific and legitimate" reasons based on "substantial evidence" to reject a treating physician's opinion. *Id*. at 830-831.  The opinion of an examining physician alone can constitute "substantial evidence" because it rests on an independent examination. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  And, "[w]hen confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings." *Id.*  Finally, the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 1. Consistency with Medical Findings.

#### a. Mental Status Examinations.

The ALJ said that "[f]indings from mental status examinations, although occasionally indicative of poor memory, were generally normal."  AR 19.  Ford argues that the ALJ's finding that her mental status exams were "generally normal" inaccurately characterizes the record and ignores significant portions of it that demonstrate Ford's mental health symptoms fluctuated from mild to severe.  Pl.'s MSJ, p.11.  In support Ford cites to the mental status examinations that consistently show, she argues, her abnormal speech, below average intellect, anxious mood, slowed motor, abnormal thought processes, poor memory and impaired insight and judgment.  But the ALJ also cited many of these same reports to support his findings that Ford's exams were "generally

normal." AR 17-19. The court summarizes the disputed records that both Ford and the ALJ rely on, which are Mental Status Examination with Lourdes Apodaca, LCSW.

- Initial Interview (June 7, 2013, AR 489-493):  Ms. Apodaca noted slow speech, tangential thought process, below average intellect and poor remote memory.  But she also noted Ford was on track for her treatment goals, alert, cooperative, had appropriate affect and motor skills, and was in a euthymic mood.  She said her judgment and insight were fair.  Ford herself reported at that exam that her mood has improved, she was adjusting well to her new living situation, believes the psychotropic medications and talk therapy were helping her, and that while she "still has depressive symptoms…they are not as severe as they used to be several months ago."
- Counseling Session, 20 to 30 minutes (July 25, 2013, AR 484-485):  Ms. Apodaca made the same observations as in June but noted Ford's insight was now limited, her motor skills were slowed and she was in an apathetic mood.  Ford made minimal progress toward her goals.
- Counseling Session, 20 to 30 minutes (August 22, 2013, AR 482-483):  Ms. Apodaca made the same observations as in June except that Ford was now in an "elevated mood."  Ford was on track toward her goals.
- Counseling Session, 20 to 30 minutes (September 20, 2013, AR 478-479):  Ms. Apodaca made the same observations as in June except that now Ford was back to a euthymic mood.  Ford herself "stated her mood had improved a little (less depressive symptoms)."  Ford was on track toward her goals.
- Counseling Session, 20 to 30 minutes (November 1, 2013, AR 474-475):  Ms. Apodaca noted the same findings as in September except that now Ford's mood was anxious because she was worried about her elderly mother who was just diagnosed with Alzheimer's disease.  She noted, though, that Ford was still on track with her goals.
- Counseling Session, 20 to 30 minutes (November 21, 2013, AR 472-473):  Ms. Apodaca noted the same findings as in September except that now Ford's mood was depressed due to Ford's conflict with her sister, her daughter's desire to remain living in a group home as opposed to with Ford, and a lack of a relationship with her other daughter.  Ford made minimal progress toward her goals.
- Counseling Session, 20 to 30 minutes (December 16, 2013, AR 467-468):  Ms. Apodaca noted the same findings as in June but that her thought process improved from tangential to coherent.  Ford was in an anxious mood because she was told she showed early signs of Alzheimer's disease and her sister, with whom she lived, said she could not care for her.  Ford made minimal progress toward her goals.

- Counseling Session, 20 to 30 minutes (January 2, 2014, AR 465-466):  Ms. Apodaca noted the same findings, mood and progress as in December.
- Initial Interview (January 14, 2014, AR 460-464):  Ford's thought process was noted as tangential and she had poor recent memory.  Ford was in an anxious mood.  But Ford self-reported that she "thinks that her symptoms of depression had improved a little" and that "the psychotropic medication [is] helpful in managing depression and anxiety."
- Counseling Session, 20 to 30 minutes (January 28, 2014, AR 455-456):  Ford had labile affect but normal memory.  She was anxious due to the worsening conflict with her sister.  Ford maintained minimal progress toward goals.
- Counseling Session, 45 to 50 minutes (January 28, 2014, AR 455-456):  Ford's mood was anxious and depressed due to the worsening conflict with her sister and feeling that she is a burden on everyone. Ford experienced suicidal ideation and made minimal progress toward goals.
- Counseling Session, 20 to 30 minutes (March 3, 2014, AR 448-449):  Ford's mood remained anxious but the suicidal ideations stopped.  She was cooperative, had appropriate affect and memory was normal.  She planned to go to her cousin's house for three weeks and was on track with her goals.
- Counseling Session, 20 to 30 minutes (March 27, 2014, AR 446-447; 383-384):  Ford was coherent, cooperative and with appropriate affect.  Her mood remained anxious due to her economic concerns and living arrangement.  But Ford also reported she felt less stress after having had a break from her sister, and noted that she asked "Dr. Sepulveda to complete a form confirming that she is not capable of sustaining employment based on her mental health condition."  Ford was making minimal progress toward her goals.
- Counseling Session, 20 to 30 minutes (April 14, 2014, AR 444-445):  Ford returned to a euthymic mood, had a lower anxiety level and felt relief because she was moving out of her sister's house.  Ford was on track toward her goals.
- Counseling Session, 20 to 30 minutes (May 12, 2014, AR 442-443):  Ford was anxious but was on track with her goals.

Having reviewed these records, the court finds that the mental status exams show—at times—the findings that Ford believes are demonstrated.  But they also show that approximately one third of the time Ford was in a euthymic, or normal, non-depressed mood, was on track with her goals for approximately half the visits, was regularly alert and cooperative, had appropriate affect and fair or appropriate insight or

judgment, and at times displayed good memory.  Any reported anxiety was tied to stress coming from Ford's living arrangement with her older sister and mother.  To the extent these mental status examinations show ambiguous findings, the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti*, 533 at 1041. The court, therefore, credits the ALJ's opinion, and finds these mental status examinations to be "specific and legitimate" reasons based on "substantial evidence" to support the ALJ's findings.  *Lester*, 81 F.3d at 830-831.

### b. Consistency with Notes by the Treating Doctors.

In another inconsistency, the treatment notes from the treating psychiatrists appear to contradict the conclusions checked in the questionnaires that they filled out.  For example, Dr. Davis saw Ford two times.  On March 28, 2013, he noted that Ford was cooperative, had normal speech, spoke articulately, had linear thought processes, made appropriate associations, displayed normal thought content, and had no delusions or suicidal or homicidal ideations.  AR 385.  He found that she had limited knowledge but fair concentration and memory, and her mood was improving.  AR 385-386.  On May 16, 2013, Dr. Davis saw Ford again and largely made the same findings.[2]  AR 381-382.  But then on July 18, 2013, Dr. Davis filled out a Psychiatric Review Form and wrote that Ford suffers from depression, experienced mild improvements with medications, and that she could be expected to miss work more than three days per month because she has an inability to concentrate, her stress increases her physical pain, and she cannot organize herself or maintain continued attention.  AR 415.  These findings contradict his treatment notes, where Dr. Davis said that Ford was "linear" in thought process as opposed to "disorganized," and never noted anything negative about her concentration, attention, or relationship between stress and physical pain.  *Compare* AR 381-382 and 385-386 *with* 415.

---

[2] It appears that Dr. Davis did not mark a box for "mood."  But the court notes that the quality of the copy of the medical record is poor.

There is only one treatment note from Dr. Cabrejos, who filled out two Psychiatric Review Forms for Ford.  Dr. Cabrejos treated Ford on November 9, 2012. AR 399-400. Like Dr. Davis he found that Ford was cooperative, had normal speech, spoke articulately, had linear thought processes, made appropriate associations, displayed normal thought content, and had no delusions or suicidal or homicidal ideations.  AR 385.  In contrast to Dr. Davis, he found that Ford had appropriate knowledge and judgment, fair memory, and her mood was anxious.  AR 399.  Then on January 25, 2012, Dr. Cabrejos filled out a Psychiatric Review Form that said Ford suffered from depression, and her poor memory, poor concentration and severe anxiety rendered Ford—in his opinion—likely to miss work more than three times per month.  AR 370-372.  But in his treatment note two months earlier, Dr. Cabrejos noted that Ford had "fair memory" as opposed to "poor memory."  AR 399.  And he noted nothing negative about her ability to concentrate. *See* AR 399-400.

No treatment notes from Dr. Sepulveda are included in the AR.  He filled out a Psychiatric Review Form on March 25, 2014 that concluded Ford would miss work more than three times per month due to her anxiety, depression and "very poor memory."  AR 434-439.  In contrast, the treatment note the closest in time to that March 25 Form is a March 2, 2014 treatment note by Ms. Apodaca, which stated that Ford's memory was "normal," she was anxious but not depressed, and was on track with her goals.  AR 448-449.

Here, the conclusions of the treating psychiatrists—that Ford would not be able to work—are contradicted by their own treatment notes as well as the notes of Ms. Apodaca, the Licensed Clinical Social Worker that Ford saw most frequently.  The ALJ cited to the relevant medical records in his decision.  AR 18 (specifically citing notes from six medical visits and also citing six exhibits with GAF scores).  The court, therefore, finds that the ALJ's rejection of their conclusions as inconsistent with the record is supported by "specific and legitimate" reasons based on "substantial evidence." *Lester*, 81 F.3d at 830-831.

### c. *Consistency with Examining Doctors.*

The report of examining psychiatrist Dr. Glassman also shows support for the ALJ's conclusion.  Dr. Glassman conducted a psychiatric disability evaluation on September 14, 2012.  He noted that Ford arrived on time for the appointment, was clean, neat and well-groomed, and was "well-engaged" and made good eye contact.  AR 362-368.  While her mood and affect were depressed he also noted that she was calm, cooperative, polite and respectful, and her behavior was socially appropriate.  AR 366.  Dr. Glassman found that while Ford was presenting as more symptomatic than usual, he believed there was a substantial likelihood she would return to her previous level of functioning, and found her capable of appropriate social behavior, getting along with others, understanding and following at least simple directions.  AR 368.  He found only minor impairments in her ability to maintain concentration, persistence, pace, and to adapt to change and stresses in the workplace.  AR 368.  The court finds that this independent examination constitutes a specific and legitimate reason based on substantial evidence to support the ALJ's decision.  *See Tonapetyan*, 242 F.3d at 1149 (stating the report of an examining physician alone can constitute "substantial evidence" because it rests on an independent examination).

Tiffani Wang, a student in training under the instruction of Dr. Daraglou, prepared a report that concluded Ford would "likely not be able to return to the workforce."  AR 427.  In contrast to Dr. Glassman's assessment, this examining report is consistent with the treating psychiatrists' opinions.  Because this court found there are numerous specific and legitimate reasons to support the ALJ's decision to reject the treating psychiatrists' opinions, those same reasons also apply to the rejection of the opinion by these examining psychologists.

### 2.  Ford's Statement of Capability as a Conservator.

The ALJ's second reason for rejecting the treating psychiatrists' opinions is that "[a]t one point, the claimant considered herself capable of being her daughter's conservator and requested a letter from her doctor stating such."  AR 19.  Ford first

argues that the ALJ did not cite anything in the record to support this statement.  But he cited "Ex. 4F, p.27," which in this record is AR 401.  *See* AR 18.  Ford also argues that her personal belief that she could be her daughter's conservator, or desire to be her conservator, is not a specific and legitimate reason to reject the treating doctors' opinions.

On October 9, 2012, Ford requested a letter from her primary care physician, Dr. Gannon, "to say that she can be her daughter's conservator."  AR 401.  Dr. Gannon herself noted that "Patient appears to be stable enough to be daughter's conservator."  AR 401.  But only four months earlier, on June 11, 2012, Ford told a different primary care doctor, Dr. Worth, that she "[n]eeds a note for jury duty that her mental illness would make it hard to sit on a jury."  AR 337.  Ford said she could not sit on a jury even though at that same visit she said she was "feeling better on new meds."  AR 337.

An ALJ may reject a treating physician's opinion if it "conflicts with testimony from the claimant [herself]."  *Lester*, 81 F.3d at 831.  Ford said that she was too unstable to sit for jury duty yet four months later requested a letter stating she can serve as her daughter's conservator.  Her desire to serve as conservator, along with her primary care physician's statement that she appeared "stable enough to be daughter's conservator," conflict with the conclusions of the treating physicians that she would have to miss work more than three days a month, which is approximately, at least, one time per week.  The court finds that the ALJ's second stated reason for rejecting the treating psychiatrists' conclusions is supported by "specific and legitimate" reasons based on "substantial evidence."  *Lester*, 81 F.3d at 830-831.

### 3.  Symptoms Controlled by Medications and Therapy.

The third reason the ALJ rejected the treating psychiatrists' opinions is because "[t]reatment notes showed the claimant's symptoms were controlled on medications and therapy."  AR 19.  He cited to specific medical notes in the record stating that medications helped improve her mood.  *See* AR 18 (citing, *e.g.*, Ex. 9F, pp.36, 50).  The ALJ also noted that in May 2014, Ford told her doctor she was exercising three to four days a week for 30 minutes at a time. AR 18 (citing Ex. 9F, pp.1-2 (AR 439)).

While there were times the medications did not appear to work, there were a number of times where Ford reported that they, and the talk therapy, helped improve her moods. *See, e.g.,* 344 (Trazadone helped with sleep, January 2012), 337 ("feeling better on new meds," June 2012), AR 335 (Ford reported "doing much better" on new medications, July 2012), 489 (Ford reported medication and talk therapy helped improve mood and depressive symptoms not as severe, June 2013), 460 ("client thinks that the Psychotropic medication is helpful in managing depression and anxiety," January 2014). Other than those impairments that are expected to result in death, an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.1509. That does not appear to be the case here. Even though the medications may not have always worked, such variances do not invalidate the ALJ's finding. *See Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1996) (upholding ALJ's rejection of treating therapist's testimony where treatment notes showed that depression and anxiety were controlled at various levels). The court finds that the ALJ's third reason for rejecting the treating psychiatrists' conclusions is supported by "specific and legitimate" reasons based on "substantial evidence." *Lester*, 81 F.3d at 830-831.

## C. Rejection of Ford's Testimony.

The ALJ found Ford's statements of disability less than fully credible because they were inconsistent with the medical record, her daily activities and the ALJ's observations at the hearing. AR 16. An ALJ must determine the extent to which a claimant's symptoms "can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [those] symptoms affect [the claimant's] ability to work." 20 C.F.R. § 404.1529(a). But those statements alone cannot be decisive on a disability claim. 42 U.S.C. § 423(d)(5)(A) ("[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

A claimant's subjective symptoms must be considered in a disability evaluation.

20 C.F.R. § 404.1529; *Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996).  In deciding whether to credit a claimant's testimony about subjective symptoms or limitations, the ALJ must engage in a two-step analysis.  *Batson*, 359 F.3d at 1195; *Smolen*, 80 F.3d at 1281.  Under the first step, the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms.  *Batson*, 359 F.3d at 1195; *Smolen*, 80 F.3d at 1281.  If this test is satisfied, and there is no affirmative evidence that the claimant is malingering, then the ALJ must determine the credibility of the claimant's subjective complaints.  At the second step, the ALJ may reject the claimant's testimony about the severity of symptoms as long as he gives specific, convincing reasons for doing so.  *Batson*, 359 F.3d at 1195; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834.

Here, the ALJ found that Ford's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms.  AR 16.  Thus, this court must determine whether he gave specific and convincing reasons to reject Ford's testimony.

### 1.  Relation of Ford's Activities to Her Medical Condition.

The ALJ first discredited Ford's testimony for this reason:

> First, even if the claimant's daily activities are truly limited as alleged at the hearing, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively benign medical evidence and other factors discussed in this decision.  It appears the limited range of daily activities is a lifestyle choice and not due to any established impairment.

AR 16.

Ford argues that the ALJ failed to identify the medical evidence that he found to be "relatively benign."  P's MSJ, p.17.  This court finds, though, that the ALJ identified the

"relatively benign" medical evidence in his decision on pages 17 through 19 of the decision.  He cited to specific treatment notes and reports:

- "Treatment notes from July 9, 2012 indicated that the claimant was doing better on the new regimen (Ex. 1F, p.7)."  AR 17.
- On September 24, 2012, Jaga Nath Glassman, M.D., Board certified in psychiatry, conducted a complete consultative evaluation of the claimant (Ex. 2F). … Dr. Glassman opined the claimant was capable of behaving in a socially appropriate manner and of getting along adequately with others; capable of understanding and following at least simple instructions, possible not complex instructions; mild impairment in her capacity to maintain concentration, persistence, and pace, and to adapt to changes and stresses in a workplace setting.  AR 17-18.
- The ALJ specifically cited the treatment notes from six medical visits occurring from June 6, 2013 to May 20, 2014.  AR 18.
- The ALJ cited six exhibits that contained Ford's GAF scores.  AR 18-19.

The court finds that the citations to this medical evidence in the record are specific enough to constitute substantial evidence to support the ALJ's credibility finding.  *See* Social Security Ruling 96-7p (credibility findings "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements").  Further, it was appropriate for the ALJ to consider this evidence when assessing Ford's credibility.  *See Smolen*, 80 F.3d at 1284 (finding ALJ can consider objective medical evidence when assessing credibility).

### 2.  Ford's Daily Activities.

Next, the ALJ discredited Ford's testimony because she "did admit in Adult Function Reports that she was able to attend clubhouse activities, do some household chores, watch television, drive, and go out alone."  AR 16.  In assessing the credibility of the claimant's subjective complaints, the ALJ may consider the claimant's daily activities.  *Tonapetyan*, 242 F.3d at 1148; *Smolen*, 80 F.3d at 1284; 20 C.F.R. § 404.1529(c)(3)(i).  Differences between a claimant's allegations and her conduct qualifies as substantial evidence that may be used in a credibility determination.  *Light v. Soc. Sec. Admin,* 119 F.3d 789, 792 (9th Cir. 1997).  The court is aware, though, "that ALJs must

be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995 (9th Cir. July 14, 2014). But where a level of activity is inconsistent with a claimant's claimed limitations, then the activities bear on a claimant's credibility. *Id.*

Here, the claimed limitation is that Ford would miss more than three days of work per month. The ALJ summarized Ford's reported daily activities to include attending clubhouse activities, doing household chores, watching television, driving, and going out alone. He also noted that Ford, as well as her daughter, sister and nephew all acknowledge that Ford cared for her disabled daughter (AR 16, 185, 272), cared for her mother (AR 234) prepared meals and did chores (AR 16, 186, 273, 249, 296, 313, 235), and will drive, go out alone, shop in stores and visit her mother (AR 16-17, 184, 274, 250, 313). Ford also reported that she went to a clubhouse to do activities and manages her own checkbook. AR 303, 305.

Considering Ford's daily activities, the ALJ's finding that Ford's daily activities were inconsistent with the claimed limitation that she would miss work more than three times per month is reasonable and supported by substantial evidence. Thus, the court may not "second-guess it." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see Osenbrock*, 240 F.3d at 1166 (recognizing a claimant's daily activities were self-limited and a lifestyle choice).

### 3. ALJ's Observations at the Hearing.

The ALJ listed these specific observations from the hearing as a basis for discrediting Ford's testimony.

> The claimant alleged she had difficulty concentrating and with memory. During the hearing, the claimant did not demonstrate or manifest any difficulty concentrating during the hearing. She was able to remember past details. During the time when the claimant was being questioned, the claimant appeared to

> process the questions without difficulty, and to respond to the
> questions appropriately and without delay.  The claimant paid
> attention throughout the hearing.  While not the sole basis for
> discounting the claimant's subjective testimony, these
> observations discredit the claimant's testimony of a disabling
> condition.

AR 16.

An ALJ's observations during a hearing may serve as a basis for discrediting a claimant's testimony, and may be used in "the overall evaluation of the credibility of the individual's statements."  *Orn v. Astrue*, 495 F.3d 625, 639-640 (9th Cir. 2007).  Here, the ALJ detailed his observations of Ford at the hearing.  He was permitted to use "ordinary techniques of credibility evaluation" and made specific and supported statements.  *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002) (citations omitted) (finding ALJ properly rejected claimant's testimony based in part on her demeanor at the hearing).

The ALJ gave multiple, supported reasons for rejecting Ford's testimony, such as noting her ability to concentrate, remember details, give timely and appropriate responses, and ability to pay attention.  AR 16.  His adverse credibility finding based on his observation of Ford at the hearing was just a part of the overall evaluation of her credibility.  This court finds that the ALJ gave specific, convincing reasons to reject Ford's testimony.  *See Lester*, 81 F.3d at 834.

## III. CONCLUSION

The court finds that the ALJ's decision to deny Ford benefits is supported by substantial evidence.  Accordingly, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross motion for summary judgment be **GRANTED**.

This Report and Recommendation is submitted to the United States district judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written objections with the court and serve a copy on all parties on or before **October 20, 2016**.

The document should be captioned "Objections to Report and Recommendation."

Any response to the objections shall be filed and served on or before **October 27, 2016**.  The parties are advised that any failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Baxter v. Sullivan,* 923 F.2d 1391, 1394 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  October 5, 2016

Hon. Nita L. Stormes
United States Magistrate Judge

21